Not for Publication

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **VIDAS STANKEVICIUS,**<br><br>Plaintiff,<br><br>v.<br><br>**TOWN OF HARRISON, NEW JERSEY, HARRISON POLICE DEPARTMENT, STANLEY TITTERINGTON,** *individually and in his official capacity*, **and ARMANDO GONZALEZ,** *individually and in his official capacity*,<br><br>Defendants. | **Civil Action No.: 18-9649 (ES) (JRA)**<br><br>**OPINION** |

**SALAS, DISTRICT JUDGE**

Following Plaintiff Vidas Stankevicius's arrest at his home in June 2015, he brought the instant action for alleged violations of his civil rights against police officers Stanley Titterington and Armando Gonzalez, the Harrison Police Department ("HPD"), and the Town of Harrison, New Jersey (collectively, "Defendants"). Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. No. 29). Having considered the parties' submissions, the Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court **GRANTS in-part** and **DENIES in-part** Defendants' motion for summary judgment.

**I.     BACKGROUND**[1]

On June 13, 2015, Titterington and Gonzalez ("the Officers") were separately dispatched

---

[1]     The Court recites the facts from the parties' statements of material facts (D.E. No. 29-2 ("Defs. SMF") & D.E. No. 37 ("Pl. Res. SMF") (together, when undisputed, ("SMF"))), the deposition testimony of Plaintiff, Titterington, and Gonzalez, and the 911 transcript from the evening in question (D.E. No. 29-11, Ex. H to D.E. No.

at approximately 11:55 P.M. to Plaintiff's residence in Harrison, New Jersey for a report of loud music. (SMF ¶ 1). Both Officers wore their full uniform and arrived in marked police cars. (*Id.* ¶ 2). Upon arrival, Titterington knocked on Plaintiff's front door for approximately ten to fifteen minutes without a response. (*See id.* ¶ 3).[2] Plaintiff heard the Officers knocking, but states that he was resting on a couch located on the first floor and that he could not hear the radio from there. (*Id.* ¶¶ 4 & 6). As the door opened, Plaintiff dialed 911. (*See id.* ¶ 5). The parties dispute what happened next, which led to Plaintiff's arrest in the early morning hours of June 14, 2015. (*See id.* ¶¶ 5 & 7).

**Titterington's Account.** After Plaintiff opened the door, Titterington identified both himself and Gonzalez as police officers. (*Id.* ¶ 5; *see* Titterington Dep. at 51:2–4). Titterington contends that Plaintiff pushed him and attempted to close the door on his face, but instead closed it on Titterington's foot that was "still on the threshold." (Titterington Dep. at 51:13–18). According to Titterington, he placed his foot in the threshold to prevent the door from closing. (*Id.* at 54:5–15). He told Plaintiff to hang up with 911, but Plaintiff pushed Titterington away from the door again. (*Id.* at 51:22–24, 54:19–23 & 64:10–11 ("The initial push and then, like I said, I stepped in, he pushed me again."); *id.* at 73:18–24). At some point, Titterington asked Plaintiff for his identification, and told Plaintiff to turn off the radio. (*Id.* at 51:19–21).[3] The encounter

---

29-3 ("Trenk Cert.") ("Pl. Dep."); D.E. No. 29-9, Ex. F to Trenk Cert. ("Titterington Dep."); D.E. No. 29-10, Ex. G to Trenk Cert. ("Gonzalez Dep."); D.E. No. 35-5, Ex. 5 to D.E. No. 35 ("Pizzuto Cert.") ("911 Tr.")). Contrary to Local Civil Rule 56.1(a), Defendants submitted a responsive statement of facts to Plaintiff's responsive statement of facts. *See* L. Civ. R. 56.1(a) (permitting the movant to respond to an opponent's *separate supplemental* statement of facts, which Plaintiff opted to forego).

[2] Titterington recalled hearing music from the street and sidewalk while Gonzalez claimed that he heard music only from the font steps. (*Compare* Titterington Dep. at 41:22–42:4 & 42:22–43:2, *with* Gonzalez Dep. at 16:14–17:9). Titterington contends that after knocking on the door the first time, the music became louder. (Titterington Dep. at 46:16–19). Plaintiff admits that he had been playing the radio in his upstairs bedroom to help him fall asleep. (Pl. Res. SMF ¶ 6).

[3] Although not material, it is unclear whether Titterington made these requests after the first or second alleged push. (*Compare* Titterington Dep. at 51:19–21, *with id.* at 58:6–10, 71:24–72:3 & 72:11–24).

2

ended when Titterington placed Plaintiff under arrest for obstruction of justice. (*Id.* at 56:14–57:6). Because Plaintiff only had socks on his feet, Titterington asked if Plaintiff needed shoes and assisted him with putting them on. (*Id.* at 61:5–9 & 68:17). In addition, Gonzalez, followed by Titterington and Plaintiff, went upstairs to retrieve keys to lock the front door. (*Id.* at 68:18–70:5). While upstairs, Gonzalez turned the radio off. (*Id.* at 71:7–9).

*Gonzalez's Account.* Gonzalez arrived at Plaintiff's residence before Titterington and rang the doorbell a few times without a response. (Gonzalez Dep. at 16:1–6). Once Titterington arrived, Gonzalez stood on the sidewalk and street to watch the window of Plaintiff's residence as Titterington rang the doorbell and knocked on the door. (*Id.* at 19:7–25). At some point, Gonzalez recalls the door opening, but states that he did not notice it immediately because he had been "focused on the window above." (*Id.* at 21:1–8). Once he realized the door had been opened, he "rushed in" because Titterington was already inside; however, Gonzalez did not see Titterington enter. (*Id.* at 21:10–15 & 46:18–47:5). Upon entering, Gonzalez remembers hearing Plaintiff state words to the effect of "I'm being harassed. I'm calling 911 . . . they just broke in my house." (*Id.* at 22:8–14). Although Gonzalez stated that he saw Plaintiff assault Titterington once inside the home (*id.* at 23:25–24:13), he clarified that he "didn't see the actual contact." (*Id.* at 25:22; *see id.* at 24:17–18 (noting that Titterington jerked backwards and that "[i]t wasn't much of an assault")).[4] After this encounter, Titterington arrested Plaintiff for assault and obstruction of justice. (*Id.* at 24:19–23). Titterington then helped Plaintiff put on shoes (*id.* at 35:6–7) and Gonzalez went to retrieve Plaintiff's keys in his bedroom with Plaintiff's permission and assistance (*id.* at 35:7–11, 41:8–12 & 42:1–12). Gonzalez turned the radio off while upstairs. (*Id.* at 37:16–

---

[4] Gonzalez also stated that he did not see Plaintiff attempt to slam the door on Titterington's face. (Gonzalez Dep. at 26:11–23). Moreover, after listening to a recording of the 911 audio from that evening, Gonzalez confirmed that he could not hear a radio playing. (*Id.* at 29:1–3).

3

18).

***Plaintiff's Account.*** Plaintiff dialed 911 and opened the door as he was connected to the 911 operator. (Pl. Dep. at 98:2–14). He informed Titterington that he dialed 911 and closed the door completely but did not lock it. (*Id.* at 98:18–99:6; Pl. Res. SMF ¶¶ 5 & 7). Plaintiff stated that the door closed without issue and Titterington's foot was not in the threshold because Titterington stood at least four feet away. (Pl. Dep. at 122:12–19). According to Plaintiff, the Officers forced the door open and entered his home without his consent or a warrant. (Pl. Dep. at 99:8–12; Pl. Res. SMF ¶ 5). At this point, Plaintiff recalls telling the 911 operator that the police entered his home and were harassing him. (Pl. Dep. at 99:12–14; Pl. Res. SMF ¶ 5). Plaintiff then gave his phone to the Officers so they could speak to the 911 operator, but Titterington grabbed the phone, tried to disconnect the call, and threw the phone. (Pl. Dep. at 101:9–17 & 103:17–104:2; Pl. Res. SMF ¶ 5). Titterington then placed Plaintiff under arrest for obstruction of justice. (Pl. Dep. at 104:3–8; Pl. Res. SMF ¶ 5). After being placed in handcuffs, Plaintiff contends that the Officers "dragged" him upstairs to turn off the radio and retrieve his keys. (Pl. Dep. at 104:9–105:2 & 106:9–13).

Plaintiff maintains that he never touched or pushed Titterington. (Pl. Dep. at 122:20–123:4). Plaintiff also insists that he had been subject to consistent harassment by the HPD for alleged noise complaints lodged by his neighbors, one of whom worked as a police officer for the HPD. (Pl. Res. SMF ¶ 4). His neighbors rented the home next door from the property owners who previously occupied the residence. (*Id.*). The owners had a prior dispute with Plaintiff—stemming back to 2010—regarding the placement of their backyard fence, which Plaintiff contends encroached on his property. (*Id.*). Despite attempts to resolve this dispute with the Town of Harrison, the fence never moved. (*Id.*). Indeed, the record reflects that on June 11 and 12,

4

2015, the two days leading up to Plaintiff's arrest, the HPD went to Plaintiff's home in response to complaints regarding both the fence and excessive noise. (*Id.*).

***911 Call.*** The record contains the 911 transcript from the evening in question. It reflects the following dialogue:

> 911 DISPATCHER: 911 Operator 118, hello?
>
> UNIDENTIFIED: Yes, this is Harrison Police is harassing me, I have would like to speak—I need immediate assistance. They just made (inaudible) into my house.
>
> 911 DISPATCHER: Sir, sir, sir, you are going extremely too fast, I need for you to calm down and give me the information. What happened?
>
> UNIDENTIFIED: Harrison Police just break into my house, harassing me.
>
> 911 DISPATCHER: Harrison Police, broke into your house?
>
> UNIDENTIFIED: Yes.
>
> 911 DISPATCHER: What is your address?
>
> UNIDENTIFIED: 6 Washington Street in Harrison New Jersey.
>
> 911 DISPATCHER: 6 Washington Street?
>
> UNIDENTIFIED: Yes.
>
> 911 DISPATCHER: Is that the police in the house now, sir?
>
> UNIDENTIFIED: Yes, yes they (inaudible) yes.
>
> 911 DISPATCHER: Okay can I speak to one of the officers please.
>
> UNIDENTIFIED: Yes, please, yes.
>
> OFFICER: (outside phone call) ID, let me see ID. First, let's turn the radio off. You already called 911. First turn the radio off. You are waking everyone else in the neighborhood up. Okay, and then you are going to give me ID. We are going to lock you up for

>obstruction of justice. Okay, so I come in here and I ask for ID. And we are playing f[****] games is what you are doing, okay.
>
>UNIDENTIFIED: No, I'm calling police —
>
>OFFICER: I am the police.
>
>UNIDENTIFIED: You harassing me.
>
>OFFICER: Come here.
>
>911 DISPATCHER: Sir.
>
>OFFICER: You are under arrest. Put your hands behind your back, you are under arrest. Put your hands up. Where's the ID now? Is there anything else in your pocket we are going to need?
>
>UNIDENTIFIED: No.
>
>OFFICER: (inaudible)
>
>OFFICER: Throw him in jail.

(911 Tr. at 2–3).

***Plaintiff's Arrest Warrants & Charges.*** After Plaintiff's arrest on June 14, 2015, Titterington executed two Complaint-Warrants charging Plaintiff with (i) aggravated assault of a police officer (N.J. Stat. Ann. § 2C:121(b)(5)(a)), (ii) obstruction of justice (N.J. Stat. Ann. § 2C:29-1(a)), and (iii) false public alarm (N.J. Stat. Ann. § 2C:33-3(e)). (D.E. Nos. 29-5 & 29-7, Exs. B & D to Trenk Cert. ("Defs. Exs. B & D"); *see* SMF ¶ 8). Titterington's certification in support of probable cause for the charge of false public alarm states: "on or about 06-13-2015 in Harrison . . . NJ . . . [Plaintiff] did . . . place a call to 9-1-1 emergency telephone system, without the purpose of reporting the need for such service." (Defs. Ex. B). Titterington's certification in support of probable cause for the charges of aggravated assault and obstruction of justice states:

>[O]n or about 06-13-2015 in Harrison . . . NJ [Plaintiff] did[] within the jurisdiction of this court, commit aggravated assault by attempting to cause bodily injury to PTL Stanley Titterington, a law

6

> enforcement officer, acting in[]the performance of his duties, while in uniform or while exhibiting evidence of his authority, specifically by shoving the officer in his chest in [] the course of a field interview[.] . . .
>
> [Plaintiff did] [w]ithin the jurisdiction of this court, purposely obstruct PTL Stanley Titterington, a law enforcement officer, from performing an official function, to wit, attempting to close the door of his dwelling in the officer[']s face while an investigation of a repeated and ongoing noise complaint at the residence[.]

(Defs. Ex. D).

Titterington also executed a Complaint-Summons charging Plaintiff with disorderly conduct (N.J. Stat. Ann. § 2C:33-2(a)(1)). (D.E. No. 29-6, Ex. C to Trenk Cert. ("Defs. Ex. C")).[5] The Honorable Judge Elizabeth T. McNamara, P.J.M.C., found probable cause to arrest Plaintiff for the charges brought in the "Complaint-Warrants" and set bail at $8,000. (Defs. Exs. B & D; SMF ¶¶ 9–10).

While at the station following Plaintiff's arrest, he informed the Officers that he did not feel well and was transported by ambulence to St. Michael's Medical Center in Newark. (SMF ¶¶ 11–12). After being discharged from the hospital, he went to Hudson County Jail for ten days. (Pl. Res. SMF ¶ 13). On November 10, 2016, all underlying charges were dismissed in Hoboken Municipal Court where Plaintiff's case had been transferred. (SMF ¶ 14).

In May 2018, Plaintiff filed the instant action alleging claims under 42 U.S.C. § 1983 against Titterington and Gonzalez for malicious prosecution in violation of his Fourth Amendment rights (Count I) and under *Monell* for municipal liability against the Town of Harrison and HPD

---

[5]   Defendants improperly categorize all of these documents as "Complaint-Warrants." (*See* SMF ¶ 8). However, the record contains two "Complaint-Warrants," which authorized Plaintiff's arrest for aggravated assault, obstruction of justice, and false public alarm. (Defs. Exs. B & D). The record also includes a separate "Complaint-Summons," which did not authorize Plaintiff's arrest for disorderly conduct. (Defs. Ex. C). Unlike the "Complaint-Warrants," the "Complaint-Summons" does not include a section for a probable cause determination and issuance of an arrest warrant. (*Compare* Defs. Exs. B & D, *with* Defs. Ex. C; *see* Titterington Dep. at 80:7–9 ("Probable cause for the arrest came from pushing me. The playing [of] the loud music would have been a summons.")).

(Count II). (D.E. No. 1 ("Compl.") at 19–49).[6] Following the conclusion of fact discovery, Defendants moved for summary judgment on all counts. (Def. Mov. Br. at 3). The motion is fully briefed. (Mov. Br.; Opp. Br.; D.E. No. 39 ("Reply")).

## II.  LEGAL STANDARD

Summary judgment is appropriate if the moving party shows that there is "no genuine issue of any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of an alleged disputed fact is not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in favor of the non-moving party. *Id.* at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. For the nonmoving party to meet its burden, it must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, the

---

[6] Although the Complaint purports to raise a Section 1983 claim under various theories, including the First, Fifth, Sixth, and Fourteenth Amendments (Compl. ¶¶ 35–36), Defendants did not brief these theories and Plaintiff did not raise them in opposing Defendants' motion for summary judgment. (*Compare* D.E. No. 29-1 ("Mov. Br."), *with* D.E. No. 36 ("Opp. Br.") at 1 & n.1 (conceding that Plaintiff seeks redress for malicious prosecution only); *see id.* at 10–11 (listing elements only for malicious prosecution)). And while Defendant briefed Plaintiff's excessive force theory (Mov. Br. at 29–31), Plaintiff failed to address these arguments in opposition, which constitutes abandonment. (*See generally* Opp. Br.); *Uddoh v. Sel. Ins. Co. of Am.*, 12-0419, 2014 WL 7404540, at *7 (D.N.J. Dec. 29, 2014) (collecting cases). The parties also failed to address an illegal search and seizure theory under the Fourth Amendment. (*See* Compl. ¶¶ 35–36; *see generally* Mov. Br. & Opp. Br.). For these reasons, the Court addresses only a malicious prosecution theory under Count I.

The parties stipulated to dismissal of Plaintiff's claim under Section 1983 for false arrest/unlawful imprisonment and his state law claims for assault, battery, and false arrest, with prejudice, as time-barred by the applicable statute of limitations. (D.E. No. 28).

nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party. *See Pa. Coal Ass'n. v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

### III. DISCUSSION

Under Section 1983, a claimant may seek a civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The claimant must demonstrate that "some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law." *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)).

#### A. Section 1983 Malicious Prosecution Claim (Count I)

Malicious prosecution exists both as a state tort claim and as a violation of the Fourth Amendment. *See Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 601–04 (D.N.J. 2002). To prove malicious prosecution under the Fourth Amendment pursuant to Section 1983, a plaintiff must show that (i) the defendant initiated a criminal proceeding; (ii) the criminal proceeding ended in the plaintiff's favor; (iii) the defendant initiated the proceeding without probable cause; (iv) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (v) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Johnson v. Knorr*, 477 F.3d 75, 81–82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).

9

"The existence of probable cause is an absolute defense to a malicious prosecution claim brought either under § 1983 or pursuant to New Jersey law." *Moore v. Carteret Police Dept.*, 254 F. App'x 140, 142 (3d Cir. 2007) (citing *Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1154 (N.J. 2000)). "[P]robable cause on one charge 'does not foreclose a malicious prosecution cause of action' as to a separate charge which lacks probable cause." *Harvard v. Cesnalis*, 973 F.3d 190, 199 n.3 (3d Cir. 2020) (quoting *Johnson*, 477 F.3d at 83). Accordingly, "to survive [D]efendants' motion for summary judgment [in its entirety], the evidence, viewed in the light most favorable to [Plaintiff], must demonstrate that [D]efendants did not have probable cause" to prosecute Plaintiff for any of the charges that followed his arrest on June 14, 2015. *See Moore*, 254 F. App'x at 142.

The Officers primarily argue that they had probable cause to arrest Plaintiff for (i) aggravated assault, (ii) obstruction of justice, (iii) false public alarm, and (iv) disorderly conduct. (Mov. Br. at 11–24). Consequently, because they had probable cause to arrest, the Officers believe they had probable cause to prosecute Plaintiff on these charges. (*See id.*). Second, and relatedly, the Officers contend that because probable cause existed for Plaintiff's arrest, they are entitled to qualified immunity. (*Id.* at 24–26). Alternatively, in the event probable cause did not exist, the Officers submit that they remain entitled to qualified immunity unless a reasonable officer would have believed that no probable cause existed. (*Id.* at 25).

The Officers are not entitled to qualified immunity if (i) they "violated a constitutional right" that was (ii) "was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)); *Rivera v. Monko*, 37 F.4th 909, 915 (3d Cir. 2022).

Police officers may not arrest an individual except "upon probable cause, supported by

Oath or affirmation." U.S. Const. amend. IV.[7] Probable cause for an arrest "exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been [or is being] committed by the person being arrested." *Andrews v. Scuilli*, 853 F.3d 690, 701 n.13 (3d Cir. 2017) (quoting *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002)). Probable cause "does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482–83 (3d Cir. 1995)). "Instead," and on a motion for summary judgment, a court "view[s] all such facts and assess[es] whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred." *Andrews*, 853 F.3d at 698 (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016)). Thus, probable cause is a "fluid concept" and requires a "totality-of-the-circumstances approach." *Stafford v. Morris*, 816 F. App'x 712, 715 (3d Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 232–33 (1983)); *Harvard*, 973 F.3d at 200.

Because the Officers ultimately secured "Complaint-Warrants" that authorized Plaintiff's arrest—albeit after-the-fact—the Court must conduct a two-prong analysis to ascertain whether probable cause existed to initiate criminal proceedings as outlined in the "Complaint-Warrants."[8]

---

[7] Under New Jersey and federal law, an officer may arrest an individual with or without a warrant when he or she "has probable cause to believe that a crime has been or is being committed and that the person to be arrested has committed or is committing it." *State v. Fariello*, 366 A.2d 1313, 1321–22 (N.J. 1976); *Wright v. City of Phila.*, 409 F.3d 595, 601–02 (3d Cir. 2005).

[8] Although Plaintiff's arrest clearly constitutes a seizure under the Fourth Amendment, it cannot serve as the basis of his malicious prosecution claim because the arrest occurred without a warrant and prior to the issuance of the "Complaint-Warrants." *See Laufgas v. Patterson*, 206 F. App'x 196, 198 (3d Cir. 2006); *Mantz v. Chain*, 239 F. Supp. 2d 486, 501–02 (D.N.J. 2002) (collecting cases); *see also Thompson v. Clark*, 142 S. Ct. 1332, 1337 n.2 (2022). The Court notes, however, that the probable cause analysis as to the initiation of criminal proceedings inherently overlaps with the probable cause analysis underlying Plaintiff's arrest because both are premised on the same set of facts as stated in the "Complaint-Warrants."

First, the Court must ask whether Titterington "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant." *Andrews*, 853 F.3d at 697 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).  Second, the Court must evaluate whether those statements or omissions were "material, or necessary, to the finding of probable cause." *Id.* (quoting *Dempsey*, 834 F.3d at 468–69) (cleaned up).  When applying for a warrant, "[m]isleading assertions can relate to even 'minor details,' and do not need a separate determination of relevance.  The focus in these instances is upon evidence demonstrating that the affiant willingly and 'affirmatively distort[ed] the truth.'" *Andrews*, 853 F.3d at 698 (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)).  Furthermore, the court need not afford "substantial deference" to a neutral magistrate judge's determination of probable cause where, as here, "[the Officers] did not arrest Plaintiff pursuant to a valid arrest warrant." *St. Fleur v. City of Linden, New Jersey*, No. 15-1464, 2019 WL 4126748, at *13 (D.N.J. Aug. 30, 2019) (collecting cases) (stating that "[t]he post-arrest determination by the Municipal Court that probable cause existed to issue a criminal complaint does not convert the warrantless arrest into an arrest made pursuant to a valid warrant, nor does it alleviate [d]efendants' burden in establishing the existence of probable cause").

The Third Circuit has acknowledged a tension that "exists when probable cause is at issue in a motion for summary judgment," which is particularly applicable when analyzing alleged misrepresentations or omissions in an affidavit of probable cause. *Andrews*, 853 F.3d at 697–98.  And "[a]lthough a finding of probable cause generally can be based on an officer's credibility determinations and independent assessments of conflicting evidence, 'it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party.'" *Id.* at 698 (quoting *Dempsey*, 834 F.3d at 468).  Thus, a statement is made with reckless disregard

for the truth when the affiant, having viewed all of the evidence, "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* (quoting *Wilson*, 212 F.3d at 788).

When viewed in a light most favorable to Plaintiff, a reasonable jury could conclude that Titterington had reasons to doubt the accuracy of his certification in support of probable cause for charges of aggravated assault and obstruction of justice. *See id.* In particular, the record reflects a genuine dispute of material fact regarding Titterington's assertions that Plaintiff (i) shoved Titterington and (ii) attempted to close the door in Titterington's face. First, Titterington and Plaintiff relayed completely different accounts of what occurred prior to Plaintiff's arrest— Titterington claims that Plaintiff pushed him twice, while Plaintiff fervently denies laying hands on Titterington. (*Compare* Titterington Dep. at 51:13–24, *with* Pl. Dep. at 122:20–123:4). Similarly, Plaintiff denies closing the door on Titterington's face because, to his recollection, Titterington stood at least four feet away from the door. (Pl. Dep. at 122:12–123:4). Second, although Gonzalez observed Titterington's body jerk backwards, he did not witness the interaction between Titterington and Plaintiff before Titterington entered his residence. (*See* Gonzalez Dep. at 25:21–23). And Gonzalez admitted that the subsequent interaction between Plaintiff and Titterington "wasn't much of an assault." (*Id.* at 24:17–19). Third, the 911 call does not indicate whether Plaintiff pushed Titterington and arguably supports Plaintiff's version of the events. (*See generally* 911 Tr.). Here, the collective record suggests that Plaintiff may not have "shov[ed] the officer in his chest in [] the course of a field interview" or "attempt[ed] to close the door of his dwelling in the officers['] face." (*See* Defs. Ex. D).[9] Thus, when viewed in a light most favorable

---

[9] Furthermore, one can infer that Titterington's "willingness to affirmatively distort truth," *see Wilson*, 212 F.3d at 788, is higher here given that he drafted warrants to arrest and prosecute Plaintiff *after* the arrest occurred. *See e.g.*, *Harvard*, 973 F.3d at 203–04; *see also St. Fleur*, 2019 WL 4126748, at *13 ("where a question or genuine dispute of material fact exists regarding probable cause, one also exists regarding the existence of malice"); *Robinson v.*

13

to Plaintiff, a reasonable jury could view the conflicting evidence and find that Titterington's certification in support of probable cause was made with at least a reckless disregard for the truth.

The same holds true with respect to Titterington's certification in support of probable cause for the charge of false public alarm. Plaintiff maintains that his music could not be heard from his first-floor couch, and that he called 911 because he felt as though the police were harassing him, specifically in the context of a years-long dispute between Plaintiff and his neighbors. (Pl. Res. SMF ¶ 4). Titterington's certification, however, only reflects that Plaintiff had no purpose in seeking emergency services. (Defs. Ex. B). Again, the Court finds that the record, particularly Gonzalez's admission that he could not hear the radio playing when listening to the 911 audio, sheds doubt on Titterington's statement. (*See* Gonzalez Dep. at 29:1–3). Moreover, the 911 transcript does not reflect that the operator or Plaintiff had a difficult time hearing one another from the presence of loud background noise. (*See generally* 911 Tr.). Accordingly, Titterington's certification in support of probable cause for the charge of false public alarm could have been made with at least a reckless disregard for the truth.

If the analysis requires the court to "identify any improperly asserted or omitted facts and, if it determines there were reckless misrepresentations or omissions," it must "'excise the offending inaccuracies and insert the facts recklessly omitted' from the affidavit and assess whether the reconstructed affidavit would establish probable cause." *Dempsey*, 834 F.3d at 470 (quoting *Wilson*, 212 F.3d at 789). In doing so, the Third Circuit has instructed courts "to perform literal, word-by-word reconstructions of challenged affidavits." *Id.* Officer Titterington's reconstructed certification in support of probable cause for aggravated assault and obstruction of justice would read as follows:

---

*Jordan*, 804 F. Supp. 2d 203, 206 (D.N.J. 2011) ("The element of malice may be inferred from a lack of probable cause.").

> [O]n or about 06-13-2015 in Harrison . . . NJ [Plaintiff] did[] within the jurisdiction of this court, commit aggravated assault by attempting to cause bodily injury to PTL Stanley Titterington, a law enforcement officer, acting in[]the performance of his duties, while in uniform or while exhibiting evidence of his authority, ~~specifically by shoving the officer in his chest~~ in [] the course of a field interview[.] . . .
>
> [Plaintiff did] [w]ithin the jurisdiction of this court, purposely obstruct PTL Stanley Titterington, a law enforcement officer, from performing an official function, to wit, ~~attempting to close the door of his dwelling in the officers face~~ while an investigation of a repeated and ongoing noise complaint at the residence[.]

(*See* Defs. Ex. D). Officer Titterington's reconstructed certification in support of probable cause for false public alarm would read as follows: "on or about 06-13-2015 in Harrison . . . NJ [Plaintiff] did[] . . . place a call to 9-1-1 emergency telephone system~~, without the purpose of reporting the need for such service~~." (*See* Defs. Ex. B).[10]

To grant summary judgment, the Court must conclude that "no reasonable jury could find facts that would lead to the conclusion" that Titterington's certifications "lacked probable cause." *See Wilson*, 212 F.3d at 792.[11] The Court finds that absent assertions regarding (i) Plaintiff's

---

[10] The certification lacks specificity and appears to be a mere recitation of the crime's elements. (*Compare* Defs. Ex. B, *with* N.J. Stat. Ann. § 2C:33-3(e)). Moreover, Officer Titterington did not include the pertinent history between Plaintiff, his neighbors, and the HPD on the days immediately before Plaintiff's arrest or the prior years. (*See* Defs. Ex. B).

[11] Relevant here, the Court must examine the elements of the crimes at issue. First, aggravated assault on a law enforcement officer "acting in the performance of the officer's duties while in uniform or exhibiting evidence of authority or because of the officer's status as a law enforcement officer" occurs when one either (i) "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury"; (ii) "[n]egligently causes bodily injury to another with a deadly weapon"; or (iii) "[a]ttempts by physical menace to put another in fear of imminent serious bodily injury." N.J. Stat. Ann. § 2C:12-1(a)(1)–(3) & (b)(5)(a). Second, obstruction of justice occurs when a person "purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act." *Id.* § 2C:29-1(a). Obstruction of justice is "a crime of the fourth degree if the actor obstructs the detection or investigation of a crime or the prosecution of a person for a crime, otherwise it is a disorderly persons offense." *Id.* § 2C:29-1(b). Third, false public alarm in the fourth degree occurs when a person "knowingly places a call to a 9-1-1 emergency telephone system without purpose of reporting the need for 9-1-1 service." *Id.* § 2C:33-3(e).

The Court does not discuss the "Complaint-Summons" for disorderly conduct because, as noted above, the documentation for that charge did not provide a probable cause determination to *arrest* Plaintiff for disorderly conduct. (*See* Defs. Ex. C; Titterington Dep. at 80:7–9 (admitting that probable cause for the arrest came from pushing

alleged shoving of Titterington, (ii) Plaintiff's alleged attempt to close the door in Titterington's face, and (iii) Plaintiff's alleged lack of need for emergency services, a reasonable jury could find that the certifications lack probable cause for the corresponding charges. The existence of these contradicted facts is material to the finding of probable cause for each alleged violation and must be resolved by the jury. *See Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 322–23 (3d Cir. 2014) (citing *Anderson* for the proposition that credibility determinations are inappropriate at the summary judgment stage); *St. Fleur*, 2019 WL 4126748, at *13 (finding that "[p]laintiff's malicious prosecution claim clearly turns on a genuine dispute of material fact, as the competing testimony in the record creates an issue of fact as to whether probable cause existed for the arrest and to initiate proceedings against [p]laintiff") (collecting cases).

Under the second prong of the qualified immunity analysis, the court asks whether the rights at issue were clearly established at the time. Indeed, "there is no question that . . . the right to be free from arrest except on probable cause, was clearly established" at the time of Plaintiff's arrest. *Andrews*, 853 F.3d at 705 (quoting *Orsatti*, 71 F.3d at 483). It follows that "the right to be free from prosecutions on criminal charges that lack probable cause was also known and clearly established at the time" Titterington prepared his certifications. *Id.* (quoting *Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002)). Indeed, "it [i]s axiomatic that 'those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.'" *Dennis v. City of Philadelphia*, 19 F.4th 279, 289 (3d Cir. 2021) (quoting *Halsey*, 750 F.3d at 296). While the Third Circuit has "recognized that it is for the court to decide

---

Titterington and that Plaintiff's loud music amounted to only a summons)). Rather, Titterington initiated the charge for disorderly conduct *after* Plaintiff's arrest for the other charges at issue. Nonetheless, for the same reasons discussed herein as it pertains to Plaintiff's other charges—aggravated assault, obstruction of justice, and false public alarm— the Court finds that genuine issues of material fact exist regarding whether the Officers had probable cause to prosecute Plaintiff for disorderly conduct. *See* N.J. Stat. Ann. § 2C:33-2(a)–(b).

whether an officer's conduct violated a clearly established right," it has "also acknowledged that the existence of disputed historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). Here, whether Titterington's actions were objectively reasonable hinges on material facts in dispute that must be resolved by a jury. These unresolved facts preclude Titterington from invoking a qualified immunity defense.[12] *See Kelley v. Edison Twp.*, No. 03-4817, 2005 WL 8175967, at *7 (D.N.J. July 19, 2005); *see also St. Fleur*, 2019 WL 4126748, at *16 (first citing *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993); and then citing *Hassan v. City of Camden*, No. 08-5074, 2010 WL 4609417 (D.N.J. Nov. 4, 2010) (stating that if plaintiff's arrest occurred without probable cause and then police officers "maliciously prosecute[d] him, qualified immunity will not protect [the defendants] as these are clearly established constitutional rights"), and *Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 820 (E.D. Pa. 2001) ("[T]he right to be free from the fabrication of evidence, falsifying documents, and malicious prosecution is clearly established.")).

For these reasons, Titterington is not entitled to qualified immunity. Thus, Titterington's motion for summary judgment on Count I is **DENIED**.

### B. Section 1983 *Monell* Violations (Count II)

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's *Monell* claims under Count II. (Mov. Br. at 31–34). To impose liability on a municipality or local

---

[12] Because Gonzalez did not sign the "Complaint-Warrants" or the "Complaint-Summons" charging Plaintiff with the underlying crimes at issue, his involvement in Plaintiff's prosecution remains a mystery. (*See* Defs. Exs. B, C & D; *see also* Gonzalez Dep. at 70:4–9 (stating that he had nothing to do with processing Plaintiff at the station)). In addition, it is unclear whether Gonzalez had a duty to review Titterington's certifications in support of probable cause or whether Plaintiff had a clearly established right to such a review by another officer who was present at the time of his arrest. Thus, in accordance with the Court's accompanying Order, the Court will reserve its decision as to Gonzalez and permit him to file supplemental briefing on the issue of whether he is entitled to summary judgment on Count I. *See Scheing v. Fountain*, 729 F. App'x 175, 178 (3d Cir. 2018) ("Vague allegations of wrongdoing leveled against all defendants do not suffice because a government official is only liable for his or her own misconduct." (internal quotations omitted)).

government under Section 1983, a plaintiff must show (i) the existence of a relevant policy or custom and (ii) that the policy caused the constitutional violation alleged. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005). A municipality's liability under Section 1983 "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *see also Monell*, 436 U.S. at 690–91.

*Monell* liability based on a municipality's failure to train or supervise employees "requires a showing that the failure amounts to a deliberate indifference to the rights of persons with whom those employees will come into contact. Additionally, the identified deficiency in a city's training program must be closely related to the ultimate injury; or in other words, the deficiency in training [must have] actually caused the constitutional violation." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotations and citations omitted); *Hammon v. Kennett Twp.*, 746 F. App'x 146, 150 (3d Cir. 2018) (noting that the "policy, practice or custom" must have "directly caused [the] constitutional harm" (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004))). "[I]n order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City. of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (citations and footnote omitted). Therefore, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotations omitted).

HPD and the Town of Harrison are entitled to summary judgment on Plaintiff's *Monell* claim. In opposing summary judgment, Plaintiff submitted five exhibits. Those exhibits include: (i) a copy of the Complaint; (ii) a letter from the Town of Harrison dated April 27, 2010, addressed to Plaintiff's neighbors, regarding his complaints about the improper location of their backyard fence, which encroached three inches over his property line; (iii) photographs of Plaintiff's residence (exterior and interior), his yard, backyard fence, front stoop, and iHome radio; (iv) a copy of the Town of Harrison's ordinance "relating to unnecessary noises," dated September 22, 1947 ("Ordinance 297"); and (v) the 911 transcript from the night of Plaintiff's arrest. (D.E. Nos. 35-1 to 35-5, Exs. 1–5 to Pizzuto Cert.). However, none of these documents support a jury finding that there was (i) a custom or policy within the Township of Harrison or the HPD that (ii) caused the violation Plaintiff's constitutional rights on June 14, 2015. Plaintiff submitted no deposition transcripts, certifications, expert reports, or other documents to support his claim. Accordingly, there is no genuine dispute of material fact about whether the Township of Harrison had a custom or policy that led to a violation of Plaintiff's constitutional rights.[13] To the extent Plaintiff relies on Ordinance 297, there is no causal connection between the ordinance and the alleged malicious prosecution that occurred on June 14, 2015. *See Lesher v. Zimmerman*, 822 F. App'x 116, 121 (3d Cir. 2020) (noting that even in the absence of a constitutional violation, "Lesher has failed to show that the School District caused the alleged constitutional violation"). As Defendants point out and the Court's Opinion makes clear, Plaintiff was not prosecuted for a violation of Ordinance 297 on June 14, 2015. (Reply at 13; *see* Defs. Ex. C (charging Plaintiff for disorderly conduct under N.J.S.A. § 2C:33-2A)).

---

[13] Although Plaintiff argues that he continued to receive summonses from the HPD for noise complaints under Ordinance 297 (Opp. Br. at 20–21), he provides no factual support for his assertion that "he never played music loudly" on these other occasions and fails to explain how New Jersey's Noise Control Act of 1971 renders Ordinance 297 "null and void." (*See id.*).

## IV.     CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED in-part** and **DENIED in-part**.  An appropriate Order accompanies this Opinion.


**Dated:**  August 10, 2022                                                                  *s/Esther Salas*  
                                                                                                            **Esther Salas, U.S.D.J.**